JONATHAN D. MILLER (SBN 220848)
HOLLY C. BLACKWELL (SBN 224941)
**NYE, PEABODY, STIRLING, HALE & MILLER, LLP**
33 West Mission St., Suite 201
Santa Barbara, California 93101
Tel: (805) 963-2345
Fax: (805) 563-5385

BENJAMIN J. SWEET (PA SBN. 87338)
**DEL SOLE CAVANAUGH STROYD, LLC**
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110

*Proposed Lead Counsel*
*Attorneys for Plaintiffs Jennifer Hyle, Jessica Graham, and*
*Robert Martin and the Proposed Class*

*Additional Counsel Listed On The Signature Page*

CLERK, U.S. DISTRICT COURT

APR 24 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| JENNIFER HYLE, JESSICA GRAHAM, and ROBERT MARTIN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>FRS COMPANY, OAK INVESTMENT PARTNERS, and LANCE ARMSTRONG<br><br>    Defendants. | Case No. C 13-01456 ABC (MANx)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1) Consumer Legal Remedies Act, Cal. Bus. & Prof. Code § 17500, et seq.<br>(2) California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.<br>(3) California Unfair Competition Law, Cal. Bus. & Prof. Code § 17500, et seq.<br>(4) Breach of Express Warranty<br><br>**JURY TRIAL DEMANDED** |

1

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs
2  Jennifer Hyle, Jessica Graham, and Robert Martin (hereinafter, "Plaintiffs")
3  bring this First Amended Class Action Complaint against Defendants FRS
4  Company ("FRS" or the "Company"), Oak Investment Partners ("OIP"), and
5  Lance Armstrong (collectively, "Defendants"), individually and on behalf of a
6  proposed Class as defined herein.  In support of Plaintiffs' First Amended
7  Class Action Complaint, Plaintiffs allege the following, based on their
8  personal experiences and the investigation of counsel:

9  **I.    NATURE OF THE ACTION**

10       1.    This is a putative class action on behalf of a nationwide class
11  seeking injunctive relief and compensation for damages caused by
12  Defendants' deceptive practices in their marketing and advertising of
13  multiple sports-related energy products from the inception of Defendant
14  Armstrong's involvement with Defendant FRS on April 11, 2007 through the
15  end of his involvement on October 17, 2012 (the "Class Period").

16       2.    Based in Torrance, California, Defendant FRS manufactures,
17  sells, advertises, and markets energy and sports drinks, concentrates, chews,
18  and powders ("FRS products") throughout the United States and abroad.

19       3.    Defendant Armstrong was for many years one of the most
20  famous and idolized athletes in the world.  In 2008, Defendant Armstrong
21  was recognized as *Time* Magazine's 100 most-influential people in the world
22  after purportedly winning his then-record 7th Tour de France title.[1]

23       4.    Defendant Armstrong is also an equity owner of FRS and, from
24  April 2007 until his recent resignation from the Company, served as both a
25  member of the Board of Directors and as "FRS Ambassador".  In addition to
26  his positions within the FRS corporate structure, Defendant Armstrong was

27  ─────────────────────
[1] http://www.time.com/time/specials/packages/completelist/0,29569,1733748
28  ,00.html

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    an outspoken user of FRS products, and for many years served as the chief

2    spokesperson for Defendant FRS, leveraging his athletic fame to win FRS an

3    ever-increasing share of the highly-competitive sports drink market.  During

4    the Class Period, Defendant Armstrong was an active part of Defendant

5    FRS's management team. Defendant Armstrong's management role included,

6    *inter alia,* active participation in the formation and execution of Defendant

7    FRS' marketing and advertising strategy.

8         5.    Defendant Armstrong publicly touted his multi-faceted role as

9    spokesperson, owner, agent, director and manager –within FRS: "I sit on the

10   Board . . . represent the [FRS] brand .... speak to it ... [I am the]

11   spokesperson for [FRS products] ... ."[2]

12        6.    Similarly, Defendant FRS promoted the unique and multi-

13   faceted role Defendant Armstrong held within the company, stating on its

14   website that not only is FRS "endorsed by Lance Armstrong . . . [but]

15   ***Lance's relationship with FRS is more than an endorsement deal, it's a***

16   ***partnership***. . . . Lance has joined our Board of Directors and chosen FRS to

17   be the exclusive beverage he represents worldwide."[3]

18        7.    Indeed, Armstrong's close affiliation and ownership interest in

19   FRS was utilized by the Company to secure financing to further its reach.

20   For example, Defendant OIP managing partner Fred Harman confirmed that

21   FRS' relationship with Defendant Armstrong was the key reason that his

22   firm decided to purchase a majority ownership of Defendant FRS, stating in

23

24

25   [2] Ex. V1. *see also* https://www.youtube.com/watch?v=hjcgGTV6IXI

26   [3] http://lancearmstrongfrs.blogspot.com, *quoting* and *citing*  http://affiliate-
     marketing-forums.5staraffiliateprograms.com/affiliate-program-

27   announcements/9476-frs-healthy-energy-drink-affiliate-program-up-22-

28   a.html

3

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  a January 21, 2013 *Bloomberg* article:  "We [OIP] would not have invested
2  in this company had it not been for the Lance Armstrong relationship."

3          8.      With Defendant Armstrong firmly established as corporate
4  director, agent, owner and spokesperson for FRS at the height of his athletic
5  fame, rather than selling FRS products based upon the products' own merit,
6  Defendants instead adopted a marketing campaign that married FRS
7  products to Defendant Armstrong, for better or for worse.

8          9.      At its core, Defendants' marketing campaign was premised on
9  three fundamental deceptions:  first, that Defendant Armstrong was the only
10  seven (7) time Tour de France champion in history; second, that FRS
11  products were closely associated with Defendant Armstrong's legendary
12  athletic abilities and achievements; and, third, that FRS products– and not
13  illegal performance-enhancing substances – were the "secret weapon" that
14  enabled Defendant Armstrong's athletic achievements and abilities. Absent
15  successful acceptance by consumers of these basic deceptions, Defendants'
16  Lance Armstrong-based marketing campaign would not have achieved the
17  remarkable financial success it achieved during the Class Period, allowing
18  Defendants to reap millions in profits at the expense of unknowing Class
19  members.[4]

20          10.     Defendants' television commercials and other advertisements
21  during the Class Period aptly demonstrate Defendants' heavy reliance on
22  these deceptions. In the television commercials and advertisements,
23  Defendant Armstrong: (a) is repeatedly identified as a seven-time Tour De

24

25  _____
    [4] *See, e.g.,* Exs. B-G,  V1-V8;
26  *see* http://web.archive.org/web/20100224165607/http://www.frs.com;
    *see also* http://youtu.be/-cXs4gaB1-A;
27  http://web.archive.org/web/20100115174720/http://www.youtube.com/user/
28  TheFRSHealthyEnergy

4

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   France champion; (b) is shown training or cycling with intense effort; (c) is

2   shown consuming FRS products; and/or (d) claims that the "secret weapon"

3   that makes Defendant Armstrong's abilities and accomplishments possible is

4   his use of FRS products.[5]

5        11.    Tellingly, in a September 2008 review of FRS' advertisements,

6   the National Advertising Division ("NAD") found that FRS' advertisements

7   improperly suggested that FRS products were linked to Defendant

8   Armstrong's athletic abilities and achievements.

9        12.    Defendants also directly linked, advertised and marketed

10   Defendant Armstrong and his supposed *"secret weapon"* – FRS products –

11   with his performance at the Tour de France while Defendant Armstrong

12   competed in the Tour. These advertisements showcased Defendant

13   Armstrong, along with the words "*7 Time Tour de France Winner*."[6]

14        13.    Defendants also advertised FRS by highlighting the fact that

15   Defendant Armstrong was both the Company's spokesperson and a corporate

16   Director, in order to reinforce Defendant Armstrong's strong association to

17   FRS in the minds of the consuming public.[7]

18        14.    As described in detail herein, consumers (including members of

19   the Class) bought in immediately; Defendants' Lance Armstrong-based

20   marketing campaign had an immediate and dramatic positive impact on FRS

21   product sales: *FRS grew five-fold in the years after Lance Armstrong*

22   *became an FRS equity owner, joint venture partner, spokesperson,*

23

24

25   [5] *See id.*

26   [6] *See,e.g.,* Exs. A-C, V1; https://www.youtube.com/watch?v=hjcgGTV6IXI;

27   http://web.archive.org/web/20100313062626/http://www.frs.com/frs-lance-armstrong

28   [7] *See, e.g.,* Ex. D.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   *manager, Board member and company agent,* according to a July 10, 2012

2   *Business Insider* article.

3       15.    As is now well known and documented, according to the

4   damning and detailed findings of the U.S. Anti-Doping Agency ("USADA")

5   in October 2012, Defendant Armstrong's use of illegal performance

6   enhancing substances continued unabated during the Class Period (while he

7   was an owner, spokesperson, corporate coard member, manager and agent of

8   FRS), including during his return to professional cycling and the Tour de

9   France in 2009 and 2010.  The USADA report stated that, "*an expert*

10   *examination of Armstrong's blood parameters establish that the likelihood*

11   *of Armstrong's blood values from the 2009 and 2010 Tours de France*

12   *occurring naturally is less than* <u>*one in a million*</u>*, and build a compelling*

13   *argument consistent with blood doping.*"

14   (emphasis added).[8]

15       16.    Allegations and evidence of Defendant Armstrong's doping

16   were well-known to those who were working with him for years before, but

17   Defendants, who were financially incentivized by sales of FRS products,

18   turned a blind eye to all such allegations and evidence of illegal and

19   improper conduct by Defendant Armstrong, including (a) credible claims of

20   doping against Defendant Armstrong by former Tour de France winner

21   Floyd Landis in early 2010; and (b) a 2010 federal government investigation

22   into doping by Defendant Armstrong. Upon information and belief,

23   throughout this time period *Defendants never conducted any meaningful*

24   *investigation of potential doping activity by Defendant Armstrong*.

25       17.    Defendants' head-in-the-sand approach to Defendant Armstrong

26   could not last forever and on October 10, 2012, the patent falsity of all

27

28     [8] *See* Ex. E; *see also* http://cyclinginvestigation.usada.org/

6

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    aspects of Defendants' Lance Armstrong-based marketing campaign, which

2    was overwhelmingly responsible for FRS's exponential increase in sales

3    during the Class Period, was finally revealed when, contrary to vehement

4    denials over the span of more than a decade that he had *never* used illegal

5    substances, the USADA report overwhelming demonstrated the scope and

6    extend of Defendant Armstrong's doping activity.

7         18.    Left with no available retreat, in January 2013, Defendant

8    Armstrong finally admitted in a nationally televised interview with Oprah

9    Winfrey that he had, in fact, repeatedly used illegal substances, including

10   banned performance-enhancing drugs and human growth hormones,

11   throughout his athletic career.  In that interview, Defendant Armstrong

12   further stated:  "*I lied and lied repeatedly*" and confirmed that his career of

13   illegal substances, including banned performance-enhancing drugs and

14   human growth hormones, was the *only* way Defendant Armstrong could

15   possibly have won 7 Tour de France titles or exhibited the extra-ordinary

16   strength, speed, energy and endurance Defendants claimed, advertised and

17   marketed during the Class Period was closely associated with resulting from

18   Defendant Armstrong's use of his purported "secret weapon", FRS

19   products.[9]

20        19.    But for Defendants' false, deceptive, and misleading

21   advertisements, described herein, consumers, including Plaintiffs and the

22   Class, would not have purchased FRS products or would, at a minimum,

23   have purchased fewer products and/or paid less for the products they did

24   purchase.

25

26

27

28   [9] http://www.oprah.com/own_tv/onc/lance-armstrong-one.html

7

**FIRST AMENDED CLASS ACTION COMPLAINT**

## II.   JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendants, and the amount in controversy exceeds $5 Million.

21.     The Court has personal jurisdiction over Defendants because Defendants FRS and OIP are headquartered in the state of California and all Defendants had sufficient minimum contacts with the State of California and intentionally availed themselves of the laws and markets of the State of California through the promotion, sale, marketing, and distribution of products and services in the State, including, but not limited to, the products that are the subject of this class action. Moreover, the deceptive and misleading advertising and marketing of FRS products originated in and emanated from California.

22.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a)(1), because Defendant FRS is headquartered and conducts its business from Torrance, California, which is in this District, and because all Defendants conduct substantial business within this District. Venue also properly lies in this District pursuant to 28 U.S.C. §1391(b)(2) because Plaintiffs Hyle and Graham reside in this District, were subjected to Defendants' misleading advertisements in this District, were induced through Defendants' advertisements to purchase FRS' products in this District, and sustained damages in this District.

**FIRST AMENDED CLASS ACTION COMPLAINT**

A.   **Application of California Law To Consumers Nationwide is Appropriate**

23.    Defendants FRS and OIP are headquartered in California and Defendants' advertising, marketing and product promotion was conceived in, and emanates from, Defendant FRS's headquarters in Torrance, California.

24.    Application of California law to consumers nationwide is appropriate because Defendants maintain their marketing and advertising department(s) in Torrance, California where the alleged misconduct, described herein, emanated from.  In addition, Defendants' products are distributed throughout the United States from their facilities located in Torrance, California.

II.    **PARTIES**

25.    Defendant FRS maintains its headquarters and principal place of business at 20100 S. Vermont Avenue, Torrance California, 90502, in the County of Los Angeles.  Defendant FRS operates in and from California throughout the United States, and is privately held.  Defendant FRS was founded in 2003 as New Sun Nutrition, Inc. and in 2007 changed its name to The FRS Company. FRS develops, manufacturers, markets, advertises, and promotes a line of energy supplements (i.e., ready-to-drink concentrates, chews, drinks, shots, and powders).

26.    Defendant Oak Investment Partners ("OIP") has a headquarters located at 525 University Avenue, Suite 1300, Palo Alto, CA, 94301, in the County of Santa Clara. Upon information and belief, Defendant OIP is the majority equity owner of Defendant FRS. In addition, upon information and belief, the Managing Partner at Oak Investment Partners, Fred Harmon, is a Director of Defendant FRS.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1       27.   Defendant Armstrong, upon information and belief, resides in

2   Austin, Texas, in the county of Travis, is an equity owner in Defendant FRS

3   and, from 2007 until his recent resignation from the company, was a

4   corporate Director of FRS. During the Class Period, Defendant Armstrong

5   also served as a manager, spokesperson and agent of FRS.

6       28.   Plaintiff Jennifer Hyle is a resident and citizen of Santa

7   Barbara, California.  During the Class Period, Plaintiff Hyle purchased FRS

8   products, which are the subject matter of this suit, including FRS drinks.

9   Plaintiff Hyle was generally aware of FRS's association with Defendant

10  Armstrong at the time she purchased FRS products.

11      29.   Plaintiff Jessica Graham is a resident and citizen of Santa

12  Barbara, California.  During the Class Period, Plaintiff Graham purchased

13  FRS products which are the subject matter of this dispute, including, but not

14  limited to, FRS Healthy Energy drinks.  Plaintiff Graham was generally

15  aware of FRS's association with Defendant Armstrong at the time she

16  purchased FRS products.

17      30.   Plaintiff Robert Martin is a resident and citizen of Long Beach,

18  New York. During the Class Period, Plaintiff Martin purchased FRS

19  products which are the subject matter of this dispute, including, but not

20  limited to, FRS chews and drinks. Plaintiff Martin was generally aware of

21  FRS's association with Defendant Armstrong at the time he purchased FRS

22  products.

23

24  //

25  //

26  //

27

28

---

**FIRST AMENDED CLASS ACTION COMPLAINT**

## III.   DEFENDANTS' DECEPTIVE MARKETING CAMPAIGN

### A. Defendant Armstrong Becomes a Partner, Equity Owner and Agent of FRS

31.   Consumers are increasingly health conscious.  In a study commissioned by the *Natural Products Foundation's Dietary Supplements Information Bureau*, the U.S. dietary supplements industry is estimated to be valued at a staggering $61 Billion.[10]  As a result, there are thousands of health and energy supplements currently for sale and competition among them for brand-recognition and purchasers is fierce.  The contents and labeling of these products is not subject to regulation by the FDA.

32.   Defendant FRS was formed as New Sun Nutrition, Inc. with the intention of being a healthy alternative to other sports beverages that were, often, laden with sugar and other less-than-healthy contents.  In July 2007, the company announced a corporate name change to The FRS Company in order to "to help reinforce the FRS brand in the consumer marketplace."  The company has described its target audience as "healthy, active" people who seek performance enhancers "grounded in real science."[11]

33.   The company grew quite slowly initially and, then, on April 11, 2007, agreed to an exclusive sponsorship with Defendant Armstrong under which Defendant Armstrong agreed to (a) exclusively use and market FRS products; (b) take an equity position in the company; (c) become a member of New Sun Nutrition's Board of Directors; and, (d) take an active role in the management of New Sun Nutrition:

---

[10]http://www.nutraingredients-usa.com/Industry/Supplements-industry-worth-61bn-to-US-economy
[11]http://www.adweek.com/news/advertising-branding/lance-armstrong-stars-frs-campaign-98960

**FIRST AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13

**Champion Cyclist and Cancer Survivor Brings Extensive Knowledge of Sports, Health and Wellness to New Sun Nutrition's FRS® Antioxidant- Based Beverage and Supplement Product Line**
Santa Barbara, CA, April 11, 2007 – New Sun Nutrition, a developer and distributor of healthy beverages and nutritional supplements, today announced that champion cyclist and cancer survivor Lance Armstrong has joined the company's board of directors.  In addition to serving as a business advisor and outside board member, Mr. Armstrong will also play a key role in New Sun Nutrition's marketing programs including being featured in the company's print advertising campaigns. *Mr. Armstrong is a significant equity shareholder in New Sun Nutrition and has a beverage category exclusive deal with the company…. .* Mr. Armstrong is a seven-time winner of the Tour de France who founded The Lance Armstrong Foundation in 1997 to provide cancer education, advocacy, public health and research programs. *He will play an active role in the management of New Sun Nutrition* and the FRS® antioxidant based line of healthy beverages and supplements, including advising on topics ranging from athletic conditioning, nutrition, and wellness, as well as attend periodic board meetings.[12]

14   (emphasis added).

15   34.    In addition, the press release announcing Defendant

16   Armstrong's involvement with New Sun Nutrition made clear that the

17   arrangement between him and the company was much more comprehensive

18   that the typical celebrity endorsement deal, and that Defendant Armstrong

19   would have an active managerial role within the company:

20
21
22
23

"This is a first-of-its-kind business relationship for Lance that is far broader and more comprehensive than a typical endorsement deal and involves true hands-on involvement to help this high potential company drive exponential growth," commented Bill Stapleton, Principal, Capital Sports & Entertainment, Mr. Armstrong's management company.[13]"

24
25
26
27
28

[12] Ex. F.
[13] *Id.*

12

**FIRST AMENDED CLASS ACTION COMPLAINT**

35.     An April 11, 2007 *USA Today* article confirmed that Defendant "Armstrong has become [FRS's] chief spokesman and a part owner."  It further noted that Defendant "Armstrong says he drinks [FRS] daily."

36.     Throughout the Class Period, Defendant Armstrong continued to be intimately involved in company decisions regarding Defendant FRS' management and marketing.  In Defendant Armstrong's own words: "I sit on the Board . . . represent the [FRS] brand . . . speak to it . . . [I am the] spokesperson for [FRS products]."[14]

37.     In fact, Defendant Armstrong's own statements leave little doubt that *the* key message Defendants hoped to drive home to consumers was that they should use FRS because of its extremely close connection to Defendant Armstrong (and not because of the product's purported benefits). This central message is demonstrated by the following FRS ad, during which Defendant Armstrong stated that consumers should purchase FRS products because:

> "I sit on the Board . . . I test and work with [FRS] products. I represent the brand . . . speak to it . . . [I am the] spokesperson for it . . . Most Importantly, *I am a User [who] actively uses the product on a daily basis* . . . If somebody said to me you can say one thing [about why to use FRS products, as opposed to the thousands of other energy and/or health items out there on the market] **I'd say 'I drink it' would be the most important thing.**"[15]

(emphasis added)

38.     In addition, Defendant FRS's website touted Defendant Armstrong's relationship with Defendant FRS as well as his use of FRS products stating that not only are FRS products "endorsed by Lance Armstrong . . . [but] Lance's relationship with FRS is more than an

---

[14] Ex. V1.
[15] *Id.*

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   endorsement deal, it's a partnership. . . . Lance has joined our Board of

2   Directors and chosen FRS to be the exclusive beverage he represents

3   worldwide."[16]

4       39.    Defendants also advertised for FRS by featuring Defendant

5   Armstrong appearing as the Company's spokesperson and Director, in order

6   to reinforce Defendant Armstrong's strong relationship with FRS in the

7   public eye.[17]

8       40.    Based on Defendant Armstrong's positions with FRS as a

9   corporate director, agent, owner and spokesperson (coupled with the

10  conspicuous and overwhelming emphasis Defendants placed in their Lance

11  Armstrong-based advertising and marketing to stress to consumers and the

12  Class that Defendant Armstrong was more than the Company's endorser, but

13  a member of the FRS Board of Directors and a "*partner*" with FRS), at all

14  times during the Class Period, Defendant Armstrong had the actual and

15  apparent authority to bind Defendant FRS.

16      41.    FRS put Defendant Armstrong in a position that enabled him,

17  while acting and/or apparently acting within his authority for and on behalf

18  of FRS, to commit gross negligence, or alternatively, fraud upon Plaintiffs

19  and the Class.   At all times during the Class Period, Defendant Armstrong

20  acted in a managerial and agent capacity for FRS while acting within the

21  scope and course of his employment for FRS.  This caused Plaintiffs and the

22  Class to reasonably believe that Defendant Armstrong was, in fact, an agent

23  for FRS.

24

25  _____

26  [16]*See* http://affiliate-marketing-forums.5staraffiliateprograms.com/affiliate-
    program-announcements/9476-frs-healthy-energy-drink-affiliate-program-

27  up-22-a.html; http://www.frs.com/lance.html

28  [17] *See, e.g.,* Ex. D.

**FIRST AMENDED CLASS ACTION COMPLAINT**

42.    With Defendant Armstrong entrenched as spokesperson, owner, agent, director and manager within FRS, Defendants built their entire marketing campaign around the Lance Armstrong brand.  This campaign was premised on three key deceptions:  first, that Defendant Armstrong was the only seven (7) time Tour de France champion in history; second, that FRS products were closely associated with Defendant Armstrong's legendary athletic abilities and achievements; and, third, that FRS products– and not illegal performance-enhancing substances – were the "secret weapon" that enabled Defendant Armstrong's athletic achievements and abilities.

43.    Even after Defendants FRS and OIP knew or should have known that Defendant Armstrong's publically advertised statements for FRS were false and/or misleading, Defendants each continued to approve of Defendant Armstrong's conduct by (a) making public statements defending Defendant Armstrong against serious allegations of doping, and (b) continuing to run false and/or misleading advertisements featuring Defendant Armstrong.

44.    Under the causes of action set forth herein, Defendants FRS and OIP each had a non-delegable duty to ensure that Defendant Armstrong was not making false and/or misleading statements in connection with FRS products.

45.    In addition to the business relationships set forth above, or in the alternative, Defendants each intentionally entered into an agreement to combine their property, skill, knowledge, and public persona to carry out a joint venture to manufacture, advertise, and sell a substantial amount of FRS products. In doing so, Defendants agreed to share the control, profits, and losses associated with this joint venture.

15

**FIRST AMENDED CLASS ACTION COMPLAINT**

B.    **Defendants' Lance Armstrong-Based Marketing Campaign**
      **Dramatically Increases FRS Product Sales**

46.    Defendants engaged in a comprehensive marketing campaign (print, internet and video -- both television commercials and internet videos) -- to promote FRS products and their alleged connection with Defendant Armstrong's athletic performance.

47.    Defendant FRS's growth and market-share exploded immediately after the commencement of the affiliation with Defendant Armstrong.  An April 27, 2008 *San Francisco Business Times* article stated that FRS's 2007 revenues doubled from the year prior.

48.    Defendants' campaign focused on Defendant Armstrong's use of FRS tied to his athletic achievements and the Tour de France continued to drive sales in 2008. In a 2009 *AdWeek Magazine* article, the Company claimed (a) that its sales in 2008 increased 275% from the previous year, and (b) that similar growth was expected going forward.[18]

49.    Defendants brought to bear significant financial resources in support of their Lance Armstrong-based marketing campaign.  A June 1, 2010 *Forbes* article stated that the campaign's price tag was $30 million between 2009 and 2010.

50.    Simultaneously, during the Class Period, Defendant Armstrong—and his endorsers and supporters—vehemently and repeatedly denied that Defendant Armstrong had ever used illegal substances, banned human growth hormones or performance-enhancing drugs.[19]

---

[18] *See* http://www.adweek.com/news/advertising-branding/lance-armstrong-stars-frs-campaign-98960

[19] http://chicago.cbslocal.com/2013/01/14/video-lance-armstrong-repeatedly-denies-doping-over-the-years/

16

**FIRST AMENDED CLASS ACTION COMPLAINT**

C.   **Defendants' Marketing Campaign Deceptively Ties**
**Defendant Armstrong's Endurance and Athletic**
**Performance To His Use of FRS**

51.   Defendants' Lance Armstrong-based marketing campaign was premised on the pitch that the extraordinary results allegedly provided to Defendant Armstrong could be similarly obtained "by athletes or even non-athletes, for the young and for the old."[20]

52.   Defendant Armstrong himself, knowing full-well that his real "secret weapon" was his use of illegal performance-enhancing drugs, encouraged the belief that FRS products were responsible for his endurance. In Defendants' press release dated January 19, 2010, Defendant Armstrong, speaking on Defendants' behalf, falsely stated that: ***"I need something that is going to give me maximum endurance . . . I rely on FRS because it helps give me an edge ... ."***[21]

53.   In an advertisement for FRS products, Defendants also falsely stated that it was FRS' products—and not illegal substances – that was responsible for Defendant Armstrong's superior endurance and performance. In a June 16, 2009 television ad, Defendant Armstrong stated:

> "I believe in [FRS products]. . .You want something you drink and 15 minutes later you feel strong, and an hour later you feel strong. . . ***It's something that when I looked at my performance on a day to day basis, I don't need to go through my day constantly seeking another drink [other than FRS products] to get me going ... ."***

(emphasis added).[22]

---

[20] *See* Ex. V1.
[21] *See* Ex. G. .
[22] *See* Ex. V1.

17

**FIRST AMENDED CLASS ACTION COMPLAINT**

54.     In a June 24, 2009 FRS press release, Defendant Armstrong similarly stated:

> "My own experience [is] that [FRS] naturally enhances my energy" . . . said Lance Armstrong, seven time Tour de France winner and FRS board member. "As a dad and professional athlete, FRS Healthy Energy helps me keep up with my active lifestyle by sustaining my energy and enhancing my training and competitive efforts. FRS is a key part of my daily fitness routine."[23]

55.     An FRS company advertisement also misleadingly quotes Chairman Armstrong as saying: "*I need something to keep me going. FRS [] has been the choice for me!*"[24]

56.     Defendant Armstrong also deceptively states in an FRS video advertisement in which he consumes a can of FRS on camera:

57.     "Just like you, I have alot going on, so I need all the energy I can get.  What Drives You?"[25]

58.     In truth, Defendant Armstrong's endurance and performance was aided significantly by his use of illegal substances, a material omission that deceived consumers.

**D.      Defendants Deceptively Claim That FRS Is Defendant Armstrong's "Secret Weapon"**

59.     Most recently, Defendants engaged in a powerful marketing campaign based on the assertion that "Lance Armstrong Has a Secret."   In those commercials, Defendants claimed that Defendant Armstrong's "Secret Weapon" was FRS products and vividly showed Defendant Armstrong

---

[23]http://web.archive.org/web/20100120005257/http://media.frsplus.com/news/releases/FRS_PressReleaseUnivOfSC_StudyUPDATED.pdf
[24] *See* Ex. H.
[25] *See* Ex. V4.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   engaged in competition and training, supposedly fueled by FRS products.

2   These advertisements were featured by Defendants: (i) in print form; (ii) as

3   billboards supplied by Defendants to retail cycling and sports stores; (iii) as

4   parts of Defendants' viral internet campaign, including video advertisements

5   on YouTube, Twitter, Facebook, FRS.com and other Tour de France Cycling

6   team websites; (iv) in 30-second television commercials, which appeared on

7   the leading sports-channels across the country, including ESPN and ESPN2;

8   and (v) during live television-coverage of the Tour de France.[26]

9          60.    The "Secret Weapon" campaign was especially insidious

10  because it overtly (and falsely) claimed that Defendant Armstrong had a

11  secret but that this secret was his use of FRS products.  In reality, as is now

12  publicly known, Defendant Armstrong's real "secret weapon" was his use of

13  illegal performance enhancing substances, which allowed him to (a) win

14  seven Tour de France titles; (b) gain widespread fame and substantial

15  financial fortune; and (c) earn a platform as a highly-coveted business

16  partner.  Moreover, as described herein, the USADA has amply

17  demonstrated that Defendant Armstrong was using illegal performance-

18  enhancing substances *at the time of the "Secret Weapon" campaign.*

19        **E.    Defendants' Use Other Methods To Further Their Deceptive**

20             **Campaign Linking Defendant Armstrong to FRS**

21          61.    Upon information and belief, for the duration of the Class

22  Period and in order to further spread Defendants' deceptive Lance

23  Armstrong-based campaign, Defendants utilized internet-based advertising

24

25  [26]*See, e.g.,* Exs. G, I, V1, V3, V5-V8.

26  http://www.businesswire.com/news/home/20100119007638/en/Lance-
    Armstrong%E2%80%99s-%E2%80%9CSecret-Weapon%E2%80%9D-

27  Revealed-Advertising-Campaign;

28  http://web.archive.org/web/20100224165607/http://www.frs.com/;

**FIRST AMENDED CLASS ACTION COMPLAINT**

strategies, and other forms of non-traditional advertising and marketing. These methods included Defendants' creation and use of: (i) "Affiliate Partners" to sell FRS products on Defendants' behalf; (ii) a widespread "viral" E-Commerce platform implemented by Demand Media, Inc.; and (iii) their creation of a separate Channel on YouTube.com exclusively dedicated to Defendant Armstrong and his supposed "secret weapon," FRS products.

62.    On April 27, 2008, the *San Francisco Times* reported that Maigread Eichten, President and CEO of FRS, described the Company's aggressive internet/e-commerce advertising approach featuring Defendant Armstrong:

> [T]he endorsement and close involvement of Tour de France winner Lance Armstrong, is something Eichten and her lead investor [Oak Investment Partners] thinks will sell. . . . E-commerce is a major sales platform for FRS, one where it has an unusual sales strategy. . . .  FRS will have 1.5 billion banner impressions this year [2008]. They promote a two-week free sample of FRS' product line of chews, concentrates, powders and ready-to-drink cans delivered to users' homes. Eichten won't share how many recipients become customers, but the number's high enough to justify sending out 250,000 free samples, each worth $65, this year. That's a retail value of $16.25 million.[27]

63.    Upon information and belief, every one of Defendants' 1.5 billion annual internet-advertisements substantially featured Defendants' deceptive Lance Armstrong-based campaign and each advertised Defendants' marketing statement linking Defendant Armstrong and his use of FRS to Defendant Armstrong's purported athletic achievements at the Tour de France.

---

[27]http://www.bizjournals.com/sanfrancisco/stories/2008/04/28/story14.html?page=all

**FIRST AMENDED CLASS ACTION COMPLAINT**

64.    FRS also established an *Affiliate Partner Program* to allow ***others*** to sell FRS products on Defendants' behalf using Defendants' deceptive Lance Armstrong-based advertising campaign.[28] Under the terms of the FRS Affiliate Program, "anyone can apply to become an affiliate (businesses, non–profits, or individuals)."[29]  In order to help generate new customers and substantial additional sales for FRS, Affiliate Partners under the program were provided by FRS with "free trial" advertising kits to transmit to consumers, which, upon information and belief, included Defendants' deceptive Lance Armstrong-based advertisements.

65.    In return for advertising and selling FRS products for Defendants, the Affiliate Partner then earns between $18.00-22.00 commission per new customer[30], and a 10% commission for any first-time purchase made by a new customer.[31]

66.    Affiliate Partners often advertised FRS products through the invocation of Defendant Armstrong.

---

[28]*See* http://web.archive.org/web/20100521042149/http:/www.frs.com/frs-healthy-energy-drink-affiliate-program

[29] *Id.*

[30]*See* http://affiliate-marketing-forums.5staraffiliateprograms.com/affiliate-program-announcements/9476-frs-healthy-energy-drink-affiliate-program-up-22-a.html

[31] Under this program, the FRS Affiliate Partner is paid their fees by FRS once a new customer pays with a credit card for shipping and handling charges related to a two-week "free trial" or any purchase from the FRS.com web store.  Under the terms of the "free trial" offer, once the two week "free trial" period is complete, if the customer does not affirmatively cancel their FRS subscription, they are automatically billed by FRS every several weeks on the credit card provided.  FRS Affiliate Partners are also provided significant incentives by FRS to diligently push FRS products and get new customers for FRS, as FRS affiliates also receive a performance incentive of a 20% increase in commissions they are paid after the Affiliate Partner generates 50 leads in a given month. *Id.*

21
**FIRST AMENDED CLASS ACTION COMPLAINT**

> "We've all seen Lance Armstrong and the 7 Tour de
> Frances that he won . . . FRS [products] – if it's good
> enough for Lance [to win 7 Tour de France world titles], it
> is good enough for me!" [32]

67.     Upon information and belief, every Affiliate Partner, each of the customers they generated on behalf of FRS, any purchaser of FRS products generally, and any person who visited or signed up for a newsletter at Defendants' FRS.com or HealthyEnergy.com websites were also provided by FRS with regular newsletters that featured Defendant Armstrong cycling and/or training with intense effort while using FRS products and also pictured Defendant Armstrong drinking and using FRS before cycling events, marathons, and other sporting competitions. [33]

68.     Incredibly, subsequent to the USADA Report released in October 2012 and even after Defendant Armstrong's nationally televised admissions to doping in an interview with Oprah Winfrey in January of 2013, there are still FRS Affiliate Partners [34] and other sellers on major websites on the internet (including Ebay and Amazon) [35] who are *currently* selling and

---

[32] *See, e.g.,* Ex. A.

[33] *See, e.g.,* http://www.healthyenergy.com/NewsLetter/february_2009/california.html;
http://web.archive.org/web/20080804014902/http:/www.healthyenergy.com/newsletter_0001.aspx#story2

[34] *See, e.g.,* http://www.trinowfitness.com/en/FRS-Energy-Chews.html;
http://www.healthynewage.com/blog/frs-healthy-energy-products.

[35] *See, e.g.,* http://www.amazon.com/FRS-Antioxidant-Health-sponsored-Armstrong/dp/B001AV56E8; http://www.ebay.com/itm/1-BAG-FRS-Healthy-Energy-Chews-Antioxidant-B-6-Supplement-Lemon-Lime-Fruit-Chews-/251116481663?pt=LH_DefaultDomain_0&hash=item3a77b56c7f;
http://www.ebay.com/itm/4-BAGS-FRS-Energy-Chews-Healthy-Energy-Boost-120ct-/261054866912?pt=LH_DefaultDomain_0&amp;hash=item3cc81525e0

22

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  advertising FRS products using Defendants' deceptive Lance Armstrong-
2  based campaign.
3      69.   In addition to (a) using their own websites at FRS.com and
4  HealthyEnergy.com (amongst others[36]) and engaging in a multi-million
5  dollar television-based marketing and advertising campaign to feature and
6  promote FRS products as Defendant Armstrong's supposed "secret weapon",
7  in January 2010, Defendants created and launched their own FRS Healthy
8  Energy Channel on YouTube.com to showcase and further promote
9  Defendants' deceptive Lance-Armstrong based campaign.[37] FRS's website
10 explained Defendants' rationale behind the Lance Armstrong-based YouTube
11 Channel:

> As the energy to help fuel the new Lance Armstrong
> campaign, FRS® has added a new chapter for content
> viewing. The purpose of The FRS Healthy Energy®
> Channel on YouTube is to build a holistic place for
> viewers to engage in FRS creative and informational
> resources. The Channel's Playlist includes several key
> buckets of content: Secret Weapon (current and future
> creative work); When It Matters (athlete highlights and
> insights); Feel the Difference (testimonials and
> interviews) and Your FRS (consumer spots and input).
> The Channel kicks off on January 5th but will be
> continually updated with more videos as FRS Healthy
> Energy continues to inspire.[38]

---

[36] *See, e.g.,* http://www.juggle.com/frs-com (stating that "[r]ight now, 98 other sites contain links to frs.com, which first came online Tuesday, April 22, 1997").

[37] http://web.archive.org/web/20100115174720/http://www.youtube.com/user/TheFRSHealthyEnergy

[38] http://web.archive.org/web/20100522103010/http://www.frs.com/frs-latest-news

**FIRST AMENDED CLASS ACTION COMPLAINT**

F.     **Defendants' Deceptive Messages Take Root In the Public**
       **Consciousness**

70.     Defendants' false messages took root in the minds of consumers. For example, on February 4, 2008 on a popular website dedicated to training, diet, nutrition and cycling, "Coach Levi" informed his readers about the reasons he believed they should buy FRS products:

> Over the weekend I discovered a new energy drink called FRS Healthy Energy. . . . It turns out that this energy drink is endorsed by none other than Lance Armstrong! . . . He's even sitting on the Board of Directors for the company now, so he must really believe in this stuff. . . . Just with his endorsement I'm really considering trying this.

(emphasis added).[39]

71.     An August 2009 *Men's Journal* article stated:

> "So when I saw Lance Armstrong pitching a new healthy energy' product called FRS, I ordered a few cases ($36 for 15 cans) of the beverage. ***I figured if the world's strongest cardiovascular engine could use some legal cheating, maybe I could too.***"[40]

(emphasis added)

72.     Similarly, a September 6, 2009 blog entry at the site *Fitnessformommies.net* stated:

> "I'm sure you've all seen Lance Armstrong on the front page of Yahoo promoting FRS, right? At least, that's how I heard about it. And, if your [sic] a cyclist, you know who Lance Armstrong is- even if you are not- you should know who Lance is. He's won the Tour de France seven times, etc, etc....***If Lance is willing to put his name on it, then, it must be a good thing, right?*** The video clip of him talking about FRS is pretty powerful, as well."

(emphasis added).

---

[39] http://coachlevi.com/nutrition/frs-energy-drink-endorsed-by-lance-armstrong
[40] http://www.mensjournal.com/magazine/the-best-energy-supplement-ever-20120808

**FIRST AMENDED CLASS ACTION COMPLAINT**

73.     Additionally, a July 1, 2010 article on the website DietsinReview.com stated:

> Lance Armstrong's Workout Routine:   Lance Armstrong . . . won the Tour de France and the world was amazed as he went on to become a seven-time Tour de France champion. . . . . *A big portion of Lance's energy comes from a drink called FRS Healthy Energy.*  He is currently a member of the board of directors for the company.

(emphasis added).

74.     The misleading nature of Defendants' advertisements were also noted by the NAD, an organization that Polices and evaluates the accuracy of commercial advertisements.  In a September 2008 review of FRS's advertisements, the NAD found that, despite Defendants' claims that Defendant Armstrong was retained as a celebrity endorser and nothing more, FRS's advertisements improperly suggested that FRS products were linked to his athletic abilities and achievements.  Specifically, the NAD found:

> NAD found that a reasonable takeaway from the FRS Energy advertising is that Lance Armstrong is endorsing the product as an expert – a professional cyclist. In other words, *NAD found an implied claim that his endorsement is that he drinks the product because it enhances his performance capability as an elite athlete.*[41]

(emphasis added).

75.     Defendants took no actions to remedy the alleged misconceptions noted by the NAD and, as described above, actually furthered the misconception with FRS's "secret weapon" campaign shortly after the NAD issued its report.

///

///

///

_____

[41] Ex. J.

**FIRST AMENDED CLASS ACTION COMPLAINT**

**G.   Defendants Are Financially Incentivized to Conduct Business As Usual In the Face of Credible Assertions Of Doping Made Against Defendant Armstrong**

76.   Defendants all were incentivized financially by increasing FRS product sales – which resulted in exponential sales from 2007 through 2010 - not to investigate credible assertions of doping by Defendant Armstrong.

77.   On May 20, 2010, cyclist Floyd Landis, who for four years had maintained his innocence after being stripped of his 2006 Tour de France title for his use of illegal performance enhancing substances, claimed that Defendant Armstrong also used illegal performance enhancing substances.

78.   Shortly thereafter, the federal government announced an investigation into Landis's charges against Defendant Armstrong.  In the wake of these serious developments, Defendants did nothing.  Instead of launching their own investigation to determine whether Landis's claims had any merit, Defendants "doubled down" on their Lance Armstrong-based marketing strategy.

79.   An August 7, 2010 *Minneapolis Star Tribune* entitled "Federal Investigation Of Doping Allegations Could Hurt Foundation Arm of Lance Armstrong" FRS pushed back against the allegations against Defendant Armstrong and, in fact, affirmed the company's commitment to him and his brand.

> FRS, a privately held company, is expanding its commitment to Armstrong and the foundation. It plans to feature Armstrong, an FRS investor and board member, in national television ads this October. *FRS* also recently agreed to support the foundation for at least three more years . . . "*We believe very strongly in Lance and his cause,*"" said FRS CEO Carl Sweat.

(emphasis added).

80.   Upon information and belief, at no point in 2010, 2011 or 2012 did Defendants ever conduct any meaningful investigation of Defendant

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    Armstrong's conduct but, rather, continued to marry the FRS brand to his
2    image, to their collective financial benefit.
3         81.    In fact, as late as June 25, 2012, Defendant FRS continued to go
4    out of its way to express continued support for Defendant Armstrong. On
5    that day, a *Brandchannel* article stated:

> "While the investigation continues . . . FRS continues to
> support Lance and his commitment in raising awareness and
> fighting the war against cancer as a proud sponsor of the
> Livestrong Foundation."

(emphasis added).

6         82.    Later, in an August 24, 2012 *New York Times* article entitled
7    "Backing, Not Backing Away From Armstrong," FRS reiterated its
8    unfettered support for Defendant Armstrong:

> ***Another sponsor, FRS, a maker of energy drinks ... voiced its***
> ***continued support for Armstrong.*** "His achievements in
> raising awareness and funds for cancer advocacy," the
> company said, "embody the spirit of FRS, which is all about
> health, wellness and life performance."

(emphasis added)

**H.    Defendant Armstrong Confesses to Engaging In The Most
Sophisticated Doping Program In History Over Many Years**

         83.    On October 10, 2012, the USADA released its report of nearly
1,000 pages, which relied upon a combination of testimonies from 26
witnesses (including 11 former teammates), financial statements, emails, lab
results and other evidence.  The report concluded that not only did
Defendant Armstrong "dope," but he also ***"ran the most sophisticated,
professionalized and successful doping program that [cycling] sport has
ever seen.***"[42]

         84.    Importantly, the USADA report concluded that Defendant
Armstrong's doping activity continued to occur throughout his return to

_____

[42] *See* Ex. E; http://cyclinginvestigation.usada.org/

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  professional cycling in 2009 and 2010, while he served as an owner,

2  spokesperson, Board member, manager and agent of FRS.  According to the

3  USADA:

> In addition to Dr. Ferrari, during 2009 and 2010 Armstrong
> surrounded himself with many of the key pieces in the U.S.
> Postal Service blood doping program, including Johan
> Bruyneel, Pedro Celaya and in 2009 Pepe Marti. Each of
> these individuals had an extensive background in, and
> experience with, blood doping Armstrong and his teammates.
>
> Moreover, there is evidence that by 2009 Dr. Ferrari [the
> physician who was the architect of Defendant Armstrong's
> doping program] was advising clients to switch from EPO
> use to blood doping in order to diminish the risk of a positive
> drug test. ***Finally, ... an expert examination of Armstrong's
> blood parameters establish that the likelihood of
> Armstrong's blood values form the 2009 and 2010 Tours de
> France occurring naturally is less than one in a million,
> and build a compelling argument consistent with blood
> doping.***

(emphasis added).[43]

85.    Finally on October 17, 2012, FRS announced that Defendant

Armstrong had resigned from its Board of Directors and ended his long

relationship with FRS.

86.    His reputation in tatters and his finances in jeopardy, Defendant

Armstrong finally admitted in a televised interview with Oprah Winfrey,

what former colleagues and cycling insiders had been claiming for years,

that, contrary to Defendants' prior claims and advertisements, his real

"secret weapon" throughout his athletic career was his use of banned

performance-enhancing drugs and human growth hormones.  It was the use

of these illegal substances that allowed Defendant Armstrong to fraudulently

[43] *Id.*

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

1    (and temporarily) capture 7 Tour de France titles, gaining him widespread

2    fame, as well as substantial financial fortune.[44]

3         87.    Defendant Armstrong's admission established that, despite

4    Defendants' claims, Defendant Armstrong did not (a) win 7 Tour de France

5    titles, or (b) exhibit the extra-ordinary strength, speed, energy and endurance

6    Defendants advertised and marketed during the Class Period as a result of

7    his daily use of his purported "secret weapon", *i.e,* FRS products.  Instead,

8    Defendant Armstrong's successes were the result of his systemic and illegal

9    use of banned performance-enhancing drugs and human growth hormones.[45]

10   Defendants' failure to disclose this fact deceived Class members.

11   **I.**    **Reasonable Reliance on Defendants' Representations**

12        88.    Plaintiffs read and relied on Defendants' advertisements and

13   marketing in conjunction with their purchase of FRS products, detailed

14   herein.

15        89.    Plaintiff Graham believed and relied on Defendants'

16   misrepresentations, false advertising and marketing, and that reliance drove

17   her decision to purchase FRS products as opposed to the thousands of other

18   energy and health products on the market and, in some instances, as opposed

19   to purchasing no similar product at all.

20        90.    Similarly, Plaintiff Martin believed and relied on Defendants'

21   misrepresentations, false advertising and marketing, and that reliance drove

22   his decision to purchase FRS products as opposed to the thousands of other

23   energy and health products on the market and, in some instances, as opposed

24   to purchasing no similar product at all.

25        91.    Finally, Plaintiff Hyle believed and relied on Defendants'

26   misrepresentations, false advertising and marketing, and that reliance drove

27   [44] http://www.oprah.com/own_tv/onc/lance-armstrong-one.html

28   [45] *Id.*

**FIRST AMENDED CLASS ACTION COMPLAINT**

1 his decision to purchase FRS products as opposed to the thousands of other

2 energy and health products on the market and, in some instances, as opposed

3 to purchasing no similar product at all.

4      92.    As a result of Defendants' misrepresentations and false

5 advertising and marketing, Plaintiffs and other consumers suffered injury in

6 fact and lost money or property.

7      93.    Consumers, including Plaintiffs and the Class, unknowingly

8 relied on Defendants' false advertising and marketing in their purchase of

9 FRS products over the thousands of other health and energy products on the

10 market.  But for Defendants' deceptive marketing, described herein,

11 consumers, including Plaintiffs and the Class, would not have purchased

12 FRS products, would have purchased fewer products and/or would have paid

13 less for FRS products.

14      94.    Defendants' misrepresentations and omissions were material to

15 Plaintiffs and other consumers.  Had the Class members known that

16 Defendant Armstrong's victories and abilities were the product of cheating,

17 his marketing efforts on behalf of FRS products would likely have **dissuaded**

18 consumers from purchasing FRS products.

19      95.    Plaintiffs and other members of the Class made their decisions

20 to purchase FRS products for the same reason:  if Defendant Armstrong

21 believed in FRS products, they must be worth the money.

22      96.    Accordingly, Plaintiffs and other consumers suffered injury in

23 fact and loss of money in the amount of the entire purchase price of each

24 FRS product they bought or, alternatively, the price differential between the

25 actual worth of the products as advertised versus sold.  Plaintiffs read and

26 relied on Defendants' misrepresentations in making their decisions to

27 purchase FRS products as opposed to the thousands of other energy and

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

1  health products currently on the market—they would not have otherwise
2  purchased FRS products.

3  **IV.    CLASS ACTION ALLEGATIONS**

4         97.    Plaintiffs bring this action as a class action on behalf of
5  themselves and the Class consisting of:

> All persons and entities who, during the Class Period,
> purchased any FRS products based in whole or in part on
> Defendants' deceptive Lance Armstrong-based marketing
> campaign.

9         98.    The Class satisfies the numerosity, commonality, typicality,
10 adequacy, predominance and superiority requirements of Federal Rule of
11 Civil Procedure 23(a).

12        99.    Plaintiffs reserve the right to amend or modify the Class
13 definitions with greater specificity or further division into subclasses or
14 limitation to particular issues after discovery.

15        100.   The members of the Class are so numerous that joinder of all
16 members is impracticable.  Although the precise number of Class members
17 is unknown to Plaintiff at this time and can be determined only by
18 appropriate discovery, it is reasonably estimated that the Class consists of at
19 least tens of thousands, or hundreds of thousands, or millions of members
20 who are geographically dispersed throughout the country.

21        101.   Because Plaintiffs are purchasers of FRS products and have
22 been subject to Defendants' systematic, deceptive and misleading course of
23 conduct, policies, and advertising intended to trick, mislead and significantly
24 confuse consumers, Plaintiffs are members of the Class and their claims are
25 typical of the claims of the members of the Class.  The harm suffered by
26 Plaintiffs and all other Class members was and is caused by the same
27 misconduct by Defendants.

28

**FIRST AMENDED CLASS ACTION COMPLAINT**

102.   Plaintiffs will fairly and adequately represent and protect the interests of the Class, in that Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel, experienced in consumer and commercial class action litigation, to further ensure such protection and who intend to prosecute this action vigorously.

103.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class members are relatively small, the expense and burden of individual litigation make it impossible for individual Class members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims was not available, Defendants would likely continue their wrongful conduct, would unfairly retain many hundreds of thousands or millions of dollars in improperly obtained revenues, or would otherwise escape liability for their wrongdoing as asserted herein.

104.   Common questions of law and fact exist as to all members of the Class which predominate over any questions that may affect individual Class members.  Among the questions of law and fact common to the Class include the following:

a.     whether Defendants' deceptive marketing campaign caused consumers to purchase FRS products;

b.     whether Defendants violated California Business and Professions Code 17500, *et seq*;

c.     whether Defendants violated California Business and Professions Code 1700, *et seq*.; and

d.     the appropriate measure of damages, restitution, pre- and post-judgment interest, and/or other relief to which Plaintiffs and the Class members are entitled.

**FIRST AMENDED CLASS ACTION COMPLAINT**

105.   The Class is readily definable, and prosecution of this action as a Class Action will reduce the possibility of repetitious litigation. Information concerning FRS products sold by Defendants is available from Defendants' books and records.  Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Class Action.

106.   The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendant in this action.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

107.   The Class is readily definable.  Information concerning the FRS products sold by Defendants is available from many sources, including Defendants' books and records.

108.   Defendants have acted and/or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(California Consumer Legal Remedies Act,
California Civil Code § 1750, *et seq.*)**

109.   Plaintiffs incorporate by reference and reassert all previous paragraphs.

110.   Plaintiffs bring this cause of action on behalf of themselves and on behalf of all other members of the Class.

111.   Defendants are "persons" as defined by California Civil Code § 1761(c).

**FIRST AMENDED CLASS ACTION COMPLAINT**

112.   Plaintiffs and members of the Class are "consumers" within the meaning of California Civil Code § 1761(d).

113.   Plaintiffs have complied with the notice provisions of the California Consumer Legal Remedies Act ("CLRA") and are therefore entitled to seek damages.  Defendants failed to provide appropriate relief for their violations of the CLRA.  Therefore, Plaintiffs now seek monetary, compensatory and punitive damages, in addition to the injunctive and equitable relief they previously sought.

114.   By falsely asserting to Plaintiffs and members of the Class (a) that Defendant Armstrong was a seven-time Tour de France champion; and (b) that the use of FRS products was the "secret weapon" responsible for Defendant Armstrong's athletic achievements and abilities, Defendants violated California Civil Code § 1770(a).

115.   Defendants' unfair and deceptive acts occurred repeatedly and were capable of deceiving a substantial portion of the purchasing public.

116.   The facts not disclosed by Defendants to Plaintiffs are material in that a reasonable consumer would have considered them important in deciding whether or not to purchase FRS products, to purchase fewer products or to pay less for them.  Had Plaintiffs and members of the Class known that (a) Defendant Armstrong was not in fact a seven-time Tour de France champion; (b) that use of FRS products were not responsible for Defendant Armstrong's remarkable athletic ability; or that (c) it was illegal performance-enhancing substances, and not FRS products, that were the "secret weapon" responsible for Defendant Armstrong's athletic achievements and abilities, they would not have purchased FRS products, purchased fewer products or paid less for the products they did purchase.

117.   Defendants' misrepresentations and omissions are likely to mislead a reasonable consumer.

**FIRST AMENDED CLASS ACTION COMPLAINT**

118.   Plaintiffs relied on Defendants' misrepresentations and omissions.

119.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiffs and members of the Class have suffered and will continue to suffer actual damages.

120.   Plaintiffs and members of the Class are entitled to equitable relief.

121.   WHEREFORE, Plaintiffs seek an order requiring Defendants to:

    (a) pay damages according to proof;

    (b) immediately cease the conduct alleged herein;

    (c) make full restitution of all monies wrongfully obtained; and

    (d) disgorge all ill-gotten venues and/or profits.

## SECOND CAUSE OF ACTION
**(California False Advertising Law –**
**Cal. Bus. & Prof. Code§ 17500, *et seq*.)**

122.   Plaintiffs incorporate by reference and reassert all previous paragraphs.

123.   Defendants engaged in unlawful conduct under California Business & Professions Code § 17500, *et seq*., by representing to consumers that Defendant Armstrong's "secret weapon" in pursuit of his athletic achievements was his use of FRS products, when, in fact, as was known by Defendant Armstrong—a corporate Director, agent and co-investor in Defendant FRS along with Defendant FRS, and was known and/or was consciously disregarded by Defendant OIP—the true secret weapon was Defendant Armstrong's use of illegal performance-enhancing drugs.

124.   Plaintiffs and the Class reasonably relied upon Defendants' representations and/or omissions made in violation of California Business & Professions Code § 17500, *et seq*.

**FIRST AMENDED CLASS ACTION COMPLAINT**

125.   As a direct and proximate result of Defendants' violations, Plaintiffs would not have otherwise purchased FRS products, or would have purchased fewer of them, and therefore, suffered injury in fact and lost money.

126.   Plaintiffs are informed and believe, and on that basis allege, that as a further direct and proximate result of the advertising described above, Defendants have received from members of the general public, including the Class, money Defendants obtained through their violation of California Business & Professions Code § 17500, *et seq.*, which Defendants continue to hold for Defendants' sole benefit.

127.   Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, seek equitable relief in the form of an order requiring Defendants to refund Plaintiffs and the Class members all monies they paid for FRS products, and injunctive relief in the form of an orders prohibiting Defendants from improperly manipulating celebrity athlete endorsements to tie the phony athletic achievements of the endorser to the use of FRS products and taking the necessary steps to prohibit all persons or entities, including FRS Affiliate Partners and major websites, from continuing to advertise and sell FRS products using Defendants' deceptive Lance Armstrong-based campaign.

### THIRD CAUSE OF ACTION
**(California Unfair Competition Law –
Cal. Bus. & Prof. Code§ 17200, *et seq.*)**

128.   Plaintiffs incorporate by reference and reassert all previous paragraphs.

129.   Defendants engaged in unlawful conduct under California Business & Professions Code § 17200, *et seq.*, by representing to consumers Defendant Armstrong's "secret weapon" in pursuit of his athletic

**FIRST AMENDED CLASS ACTION COMPLAINT**

achievements was his use of FRS products, when, in fact, as was known by Defendant Armstrong— a corporate Director, agent and co-investor in Defendant FRS along with Defendant FRS, and was known and/or was consciously disregarded by Defendant OIP——the true secret weapon was Defendant Armstrong's use of illegal performance-enhancing drugs.

130.   Defendants' conduct is unlawful in that it violates the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq., the False Advertising Law, California Business & Professions Code § 17500, *et seq.*, and Federal Trade Commissions' *Guides Concerning the Use of Endorsements and Testimonials in Advertising*, which states that "[e]ndorsements must reflect endorser's general views and must not contain any express/implied representation that would be misleading if made by the advertiser. Advertisers can be liable for misrepresentations and for failure to disclose material connections, as can endorsers."

131.   Defendants' conduct is unfair in that it offends established public policy and/or is immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and the Class members.  The harm to Plaintiffs and the Class members arising from Defendants' conduct outweighs any legitimate benefit Defendants derived from the conduct.  Defendants' conduct undermines and violates the stated spirit and policies underlying the False Advertising Law, the Consumer Legal Remedies Act, and the FTC's *Guides Concerning the Use of Endorsements and Testimonials in Advertising*, as asserted herein.

132.   Defendants' misrepresentations and omissions are likely to mislead a reasonable consumer.

133.   Plaintiffs relied on Defendants' misrepresentations and omissions.

**FIRST AMENDED CLASS ACTION COMPLAINT**

134.   As a direct and proximate result of Defendants' violations, Plaintiffs would not have otherwise purchased FRS products, or would have paid less, and therefore, suffered injury in fact and lost money.

135.   Plaintiffs, on behalf of themselves and the Class members, seek restitution of monies they paid for FRS products. Additionally, Plaintiffs seek equitable and injunctive relief on behalf of themselves and Class members pursuant to Cal. Business & Professions Code § 17203.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty)

136.   Plaintiffs incorporate by reference and reassert all previous paragraphs.

137.   Defendants expressly warranted, among other things, that FRS products were Defendant Armstrong's "secret weapon" in pursuit of his athletic achievements when, in fact, Defendant Armstrong's true secret weapon was his regular use of illegal performance enhancing drugs.

138.   Defendants' warranties constitute an affirmation of fact that became part of the basis of the bargain and created an express warranty that FRS products would and could conform to the stated promises.

139.   All conditions precedent to Defendants' liability under this contract have been performed by Plaintiffs and the Class.

140.   Defendants' breached the terms of this contract, including the express warranties, with Plaintiffs and the Class, by not providing a product that conformed or could possibly conform to the stated promises, as advertised by Defendants.

141.   As a result of Defendants' breach of its contract, Plaintiffs and the Class have been damaged in the amount of the price of the Product they purchased.

**FIRST AMENDED CLASS ACTION COMPLAINT**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for relief as follows:

A.  For an order that this action may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed Class representatives for the Class, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.  For a permanent injunction against Defendants, and each of them, restraining, preventing and enjoining Defendants from engaging in the illegal practices alleged;

C.  For an order requiring Defendants, and each of them, to disgorge the profits they wrongfully obtained through the use of their illegal practices;

D.  For an order requiring Defendants, and each of them, to pay restitution to Plaintiffs and all members of the Class.

E.  Actual damages;

F.  Punitive damages;

G.  For an award of attorneys' fees;

H.  For an award of the costs of suit incurred herein, including expert witness fees;

I.  For an award of interest, including prejudgment interest, at the legal rate; and,

J.  For such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all claims so triable.

**FIRST AMENDED CLASS ACTION COMPLAINT**

DATED:  April 24, 2013.          Respectfully submitted,


By: _Holly C. Blackwell_
    Jonathan D. Miller
    Holly C. Blackwell
    **NYE, PEABODY, STIRLING,**
    **HALE, & MILLER, LLP**
    33 West Mission, Suite 201
    Santa Barbara, CA 93101
    Tel: (805) 963-2345
    Fax: (805) 563-5385

    Benjamin J. Sweet
    **DEL SOLE CAVANAUGH**
    **STROYD LLC**
    200 First Avenue, Suite 300
    Pittsburgh, PA 15222
    Tel:  (412) 261-2393
    Fax: (412) 261-2110
    *Proposed Lead Counsel for Individual*
    *and Representative Plaintiffs Jennifer*
    *Hyle, Jessica Graham, Robert Martin*
    *and the Proposed Class*

    MICHAEL E. BERMAN
    MICHAEL E. BERMAN, P.C.
    270 Shore Road, Suite 11
    Long Beach, NY 11561
    Tel: (516) 320-9076
    Fax: (877) 522-8526

    *Additional Counsel for Individual*
    *Plaintiff Robert Martin*

**FIRST AMENDED CLASS ACTION COMPLAINT**

# EXHIBIT A

# FRS Healthy Energy – FREE TRIAL Review

by U R What U Eat
1 Follower

## FRS Healthy Energy – The start of a healthy revolution.

We've all seen Lance Armstrong and the 7 Tour de Frances that he won - and I've wondered how he did - but always commended him for overcoming cancer numerous times. I think that it's pretty simple, he makes healthy choices everyday; you know, the one where you get the craving when you go by that favorite fast food joint and you give in, rather than making something healthy at home. Well this is one of the best healthy choices that I've made in a while.



"FRS is a part of my daily routine. Though I take yet tired from cycling, my days, like the days of many other people are strenuous and I need something to keep me going. FRS Healthy Energy has been the choice for me."

LANCE ARMSTRONG
7 Time Tour de France Winner

Lance Armstrong has partnered with FRS Healthy Energy - If it's good enough for Lance, it's good enough for me!

Lance Armstrong partnered with FRS Healthy Energy and has started to turn some heads with it. FRS is one of those healthy choice opportunities you'll be glad that you made - and the best part is that it tastes great.

## I don't have time to be tired.

If you're anything like me, you are up all hours of the night trying to get things done that you just don't have time for during the day, because of work or other obligations; there's just not enough time in a day. So in order for me to be productive and have the energy I needed, as well as the mental focus, I found myself resorting to HIGH calorie, HIGH sugar energy drinks (Monster & Red Bull to name a couple).

After taking these, there's no doubt that I felt awake, but both of them left me feeling jittery and made my heart feel like it was about to beat out of my chest (can't be healthy for you), so I began searching for a healthy energy drink alternative.



This is the FRS Healthy Energy Free Trial kit that I received.

## ...and FRS Healthy Energy came to the rescue.

The first thing I thought when I came across this product, "Sure, a HEALTHY energy drink, like there is such a thing." But with the 2 week Free Trial offer

## FRS Free Trial

- FRS Healthy Energy Free Trial FRS Healthy Energy is a energy system that is full of Antioxidants that can reduce Free Radicals and can be used as an Antioxidant Supplement. Learn all

# EXHIBIT B





# LANCE ARMSTRONG

## PARTNERS WITH FRS

"FRS is a part of my daily routine. Though I have retired from cycling, my days, like the days of many other people are strenuous and I need something to keep me going. FRS Healthy Energy has been the choice for me."

**LANCE ARMSTRONG**
7 Time Tour de France Winner

Advertisement

# Tired of Being Tired?
## Fight Fatigue and Support Immune System

FRS

FRS

Try It Free*

FRS healthy energy

**Lance Armstrong**
7x time Tour de France Winner





# MORE GAME
# MORE PUSH
# MORE HUSTLE
# MORE PLAY
# MORE REPS
# MORE DRIVE

"FRS Healthy Energy has been a part of my daily routine for years. Now that I'm training professionally again, my days are especially strenuous and I need something to keep me going. FRS is the sustained energy choice for me."

LANCE ARMSTRONG
SEVEN-TIME TOUR DE FRANCE WINNER

PLAY VIDEO ▶

## FRS° HEALTHY ENERGY°

FRS HAS MORE THAN A FEW FAMOUSLY ATHLETIC FANS, PEOPLE WHO CONSTANTLY PUSH TO GET MORE OUT OF THEMSELVES. AND WHILE IT'S MADE FOR ANYONE LOOKING TO DO MORE AND GO FURTHER, SOMETIMES IT'S NICE TO SEE HOW OTHERS ARE USING FRS TO THEIR ADVANTAGE. ATHLETES LIKE LANCE ARMSTRONG, HIS STRENGTH AND CONDITIONING COACH PETER PARK, PRO-BASKETBALL CHAMPION DEREK FISHER, AND PEAK PERFORMANCE PROJECT FOUNDER MARCUS ELLIOTT.

"I need a healthy source of energy with all I have going on, I make it happen with FRS"

**Lance Armstrong**
*7 Time Tour de France Winner*

ADVERTISEMENT





















# EXHIBIT C



# EXHIBIT D



# EXHIBIT E

## REPORT ON PROCEEDINGS UNDER THE WORLD ANTI-DOPING CODE AND THE USADA PROTOCOL

UNITED STATES ANTI-DOPING AGENCY,

Claimant,

v.

LANCE ARMSTRONG,

Respondent.

## REASONED DECISION OF THE UNITED STATES ANTI-DOPING AGENCY ON DISQUALIFICATION AND INELIGIBILITY



**United States Anti-Doping Agency**

5555 Tech Center Drive, Suite 200, Colorado Springs, CO 80919 ■ Tel: 719.785.2000 ■ Fax: 719.785.2001
usada@usada.org ■ www.usada.org

## TABLE OF CONTENTS

I.  SUMMARY OF USADA'S REASONED DECISION.................................................5
II.  CHARGES AGAINST LANCE ARMSTRONG.................................................7
III.  BACKGROUND.................................................................................. 9
    A. Commencement of USADA's Broad Investigation of Doping in Cycling.......................9
    B. Criminal Investigation...........................................................................11
    C. USADA's Notice of Anti-Doping Review Board Proceedings and Notice of Opportunity to Contest USADA's Charges in Arbitration.......................................................11
    D. Armstrong's Filing of Federal Lawsuit........................................................12
    E. Federal Court's Order Dismissing Armstrong Lawsuit.......................................13
    F. Armstrong's Refusal to Contest Charges Against Him in Arbitration Hearing Before Neutral Arbitrators.........................................................................................13
IV.  DISCUSSION OF THE EVIDENCE SUPPORTING USADA'S CHARGES....................15
    A. Introduction.....................................................................................15
        1. Standard of Proof.......................................................................15
        2. Means of Proof:  Non-Analytical Evidence and Laboratory Evidence........................15
    B. Chronological Review of Evidence of Lance Armstrong's Possession, Use,  Trafficking and Administration of Banned Performance Enhancing Drugs and Other Relevant Events........16
        1. 1998..................................................................................16
            a. Possession and use of EPO at the Vuelta a España...........................18
            b. Possession and use of cortisone.........................................19
            c. Use of a saline infusion at the World Championships........................20
        2.  1999..................................................................................20
            a. Focus on the Tour de France.............................................21
            b. The "A" Team........................................................22
            c. Getting serious with Dr. Ferrari.........................................23
            d. U.S. Postal drug delivery system........................................28
            e. Possession and use of EPO..............................................29
            f. Motoman and the plan to deliver EPO at the Tour de France..................30
            g. The Tour de France....................................................31
            h. Positive for cortisone...................................................31
            i. EPO use at the Tour de France..........................................33
            j. Testosterone use and administration at the Tour de France....................34
            k. Sestriéres............................................................34
            l. Christophe Bassons....................................................35
            m. Seven witnesses and scientific corroboration..............................36
        3.  2000..................................................................................37
            a. Armstrong's involvement in the U.S. Postal Service blood doping program............38
            b. Armstrong's use of testosterone and avoiding drug testing at race in Spain .............39
            c. Armstrong's second Tour victory........................................40
            d. Blood doping at the 2000 Tour de France.................................41
            e. French investigation and "Actovegin"....................................42
        4.  2001..................................................................................45
            a. Ferrari attends USPS training camp......................................46
            b. Armstrong's continued involvement in blood doping in 2001.....................49

c. Armstrong's possession, use and trafficking of EPO in 2001............................49
d. Armstrong's suspicious test for EPO at the 2001 Tour of Switzerland...................51
e. Armstrong's possession and use of testosterone in 2001.................................52
　　f. Controversy concerning Armstrong's relationship with Ferrari and Italian law
enforcement investigation of Ferrari............................................................53
5.　2002.................................................................................................54
a. Floyd Landis.......................................................................................54
b. Landis begins working with Ferrari............................................................57
c. Armstrong's possession, use and trafficking of testosterone in 2002....................58
d. Armstrong's continued use of blood doping in 2002........................................58
e. Armstrong's enforcement of the team doping program...................................59
6.　2003.................................................................................................60
a. Armstrong's continued use of blood doping in 2003........................................61
b. Armstrong's blood doping and EPO use at the 2003 Tour de France....................63
c. Armstrong gets help from Tyler Hamilton...................................................64
　　d. Armstrong's possession, use and trafficking or administration of EPO and/or
testosterone in 2003...............................................................................65
7.　2004.................................................................................................67
a. Armstrong continues to work with Ferrari in 2004.........................................68
b. Armstrong's use of testosterone in 2004....................................................69
c. Armstrong's blood doping and EPO use at the 2004 Tour de France....................70
d. Armstrong's altercation with Filippo Simeoni at the 2004 Tour.........................72
　　e. Dr. Ferrari's October 1, 2004, conviction for sporting fraud and Armstrong's public
termination of professional relationship with Ferrari........................................73
8.　2005.................................................................................................75
a. Armstrong's use of blood transfusions in 2005.............................................75
b. Possession, use and administration of EPO.................................................76
c. Hincapie's post Tour drug sweep of Armstrong's apartment..............................76
d. Ferrari fabrication...............................................................................77
e. SCA Testimony of Bill Stapleton and Lance Armstrong regarding Dr. Ferrari..........79
9.　2009 – 2012..........................................................................................82
a. Continuing Ferrari fabrication.................................................................82
b. Evidence of blood doping......................................................................86
10. Weight to be given to Lance Armstrong's refusal to testify...............................87
C. Overwhelming Proof that Lance Armstrong's Support Staff Participated in Doping............88
1.　Dr. Michele Ferrari's involvement in doping...............................................90
2.　Johan Bruyneel's involvement in doping..................................................107
3.　Dr. Luis Garcia del Moral's involvement in doping.......................................115
4.　Dr. Pedro Celaya's involvement in doping................................................118
5.　Jose "Pepe" Marti's involvement in doping...............................................123
D. Consideration of the Credibility and Reliability of USADA's Fact Witnesses.................127
E. How Lance Armstrong and the USPS Team Avoided Positive Drug Tests............................129
1.　Avoiding testers during window of detection..............................................131
2.　Using undetectable substances and methods.............................................135
3.　Understanding limitations to the testing methods.........................................137
4.　Use of saline infusions and micro-doping of EPO.........................................139

V.   SCIENTIFIC EVIDENCE THAT CORROBORATES LANCE ARMSTRONG'S DOPING VIOLATIONS.................................................................................................139
   A. Armstrong's Blood Test Results During the 2009 and 2010 Tours de France are Consistent with His Continued Use of Blood Doping.............................................140
   B. 1999 Tour de France Samples....................................................................142
   C. 2001 Tour of Switzerland Samples...............................................................144
VI.   EVIDENCE OF ARMSTRONG'S EFFORTS TO SUPPRESS THE TRUTH ABOUT HIS ANTI-DOPING RULE VIOLATIONS................................................146
   A. Perjury and Other Fraudulent Conduct to Obstruct Legal or Judicial Processes..................146
      1.   False Statements Under Oath in SCA Arbitration.......................................146
      2.   False Statements in French Judicial Investigation.......................................147
      3.   Attempts to Procure False Affidavits....................................................148
      4.   Efforts to Prevent Witnesses From Testifying...........................................149
   B. Retaliation and Attempted Witness Intimidation.............................................149
      1.   Filippo Simeoni....................................................................149
      2.   Tyler Hamilton.....................................................................150
      3.   Levi Leipheimer....................................................................150
   C. Retaliation Against Witnesses..................................................................151
      1.   Betsy Andreu......................................................................151
      2.   Prentice Steffen....................................................................152
      3.   Jonathan Vaughters.................................................................152
      4.   Christophe Bassons................................................................153
      5.   Floyd Landis.......................................................................153
VII.   THE EIGHT-YEAR STATUTE OF LIMITATIONS FOUND IN ARTICLE 17 OF THE CODE WAS SUSPENDED BY MR. ARMSTRONG'S FRAUDULENT CONCEALMENT OF HIS DOPING AND OTHER WRONGFUL ACTS ...............................154
VIII.   USADA'S RESULTS MANAGEMENT AUTHORITY..........................................155
   A. Armstrong is bound by the USADA Protocol..................................................155
   B. USADA discovered the anti-doping rule violations under Article 15.3 of the Code............156
   C. Armstrong's assertion that UCI has exclusive jurisdiction is meritless and belied by UCI's conduct.......................................................................................157
   D. Waiver.............................................................................................162
IX.   CONCLUSION.................................................................................164

ADDENDUM – PART ONE: ADDITIONAL INFORMATION RELEVANT TO THE CREDIBILITY OF USADA'S FACT WITNESSES

   1.   Frankie Andreu..................................................................1
   2.   Michael Barry....................................................................4
   3.   Tom Danielson...................................................................5
   4.   Renzo Ferrante..................................................................6
   5.   Tyler Hamilton...................................................................7
   6.   George Hincapie.................................................................8
   7.   Jörg Jaksche....................................................................10
   8.   Floyd Landis....................................................................10
   9.   Levi Leipheimer.................................................................14

10. Emma O'Reilly.................................................................................18
11. Filippo Simeoni.............................................................................19
12. Christian Vande Velde......................................................................19
13. Jonathan Vaughters.........................................................................20
14. David Zabriskie.............................................................................22

ADDENDUM – PART TWO: ANALYSIS REGARDING INDIANA
HOSPITAL ROOM INCIDENT

# REPORT ON PROCEEDINGS UNDER THE WORLD ANTI-DOPING CODE AND THE USADA PROTOCOL

UNITED STATES ANTI-DOPING AGENCY,

    Claimant,

v.

LANCE ARMSTRONG,

    Respondent.

## REASONED DECISION OF THE UNITED STATES ANTI-DOPING AGENCY ON DISQUALIFICATION AND INELIGIBILITY

On August 24, 2012, the United States Anti-Doping Agency (USADA) announced it had imposed a sanction of lifetime ineligibility and disqualification of competitive results achieved since August 1, 1998, on United States athlete Lance Armstrong. Mr. Armstrong's sanction was announced at that time by USADA because Mr. Armstrong had notified USADA that he was refusing to contest the evidence against him in a hearing before neutral arbitrators.

Pursuant to Article 8.3 of the World Anti-Doping Code (the "Code"), after a sanction is announced because the sanctioned party has failed to challenge the charges against the party, the Anti-Doping Organization with results management authority shall submit to the entities with appeal rights a reasoned decision explaining the action taken. This document, therefore, sets forth USADA's reasoned decision describing evidence of Mr. Armstrong's rule violations (the "Reasoned Decision"), and is being sent to the Union Cycliste International (UCI), the World Anti-Doping Agency (WADA), and the World Triathlon Corporation, the entities with appeal rights relating to the Reasoned Decision.

This Reasoned Decision includes a summary of the overwhelming evidence that demonstrates that Mr. Armstrong doped throughout the majority of his professional cycling career.  Among the evidence in this case are the sworn statements[1] of more than two dozen (24+) witnesses, including fifteen (15) professional cyclists, and a dozen (12) members of Armstrong's cycling teams, including eleven (11) former teammates and his former soigneur (masseuse).  Nine (9) of the professional cyclists were, like Mr. Armstrong, clients of Dr. Michele Ferrari and have firsthand knowledge of his doping practices.

The evidence in this case also includes banking and accounting records from a Swiss company controlled by Dr. Ferrari reflecting more than one million dollars in payments by Mr. Armstrong, extensive email communications between Dr. Ferrari and his son and Mr. Armstrong during a time period in which Mr. Armstrong claimed to not have a professional relationship with Dr. Ferrari and a vast amount of additional data, including laboratory test results and expert analysis of Mr. Armstrong's blood test results.  This evidence is incorporated by reference into this Reasoned Decision as if fully set forth.

While this Reasoned Decision summarizes overwhelming evidence of Mr. Armstrong's doping that would have been presented at the hearing had Mr. Armstrong not refused to challenge the charges against him, it necessarily cannot include all of the evidence that would have been presented at such a hearing.  Had there been a hearing even more evidence would have been presented, including, evidence obtained through arbitration panel subpoenas and potentially evidence from government investigations.

Furthermore, at a hearing USADA would have been able to examine on the record and under oath members of Mr. Armstrong's inner circle and others with knowledge of Armstrong's

---

[1] Including affidavits and witness statements.

doping who refused to come forward or were unwilling to speak with USADA absent a

subpoena. Mr. Armstrong's refusal to participate in a hearing prevented the testimony of many

other witnesses from being heard.

   None of the evidence USADA summarizes in this Reasoned Decision was obtained from

the United States federal law enforcement investigation involving Mr. Armstrong. After the

announcement by U.S. District Attorney Andre Birotte on February 3, 2012, that he was

discontinuing the criminal investigation of Armstrong's conduct, USADA formally requested

copies of non-grand jury evidence from the case.[2] However, no documents have been received

to date. As a result, none of the evidence assembled by USADA has come from federal law

enforcement.[3]

---

[2] *See* April 30, 2012, Letter from USADA CEO Travis Tygart to Tony West, Acting Associate
Attorney General, provided in Appendix <u>Z</u>.
[3] USADA addresses at this point the recent criticism of the UCI offered to the media questioning
why it took USADA from August 24 until October 9 (forty-seven days) to issue this Reasoned
Decision. The UCI's criticism is unfounded. There is no fixed time limit in the rules for issuing
a reasoned decision, therefore, USADA was merely required to issue its reasoned decision
promptly. What is prompt depends on the circumstances in the case and the nature of the
evidence in it. Obviously, USADA did not know that Mr. Armstrong was not going to elect to
go to a hearing until, on the last possible day for choosing, he chose not to do so. Until then,
USADA had been preparing to go to a live hearing in front of neutral arbitrators. Had such a
hearing occurred it is unlikely that it would have begun much before the end of this year.

The task of summarizing the evidence in the case, as this Reasoned Decision does, is much
different from the process of preparing for a hearing where evidence is introduced live and
witnesses testify orally. The evidence supporting this Reasoned Decision is set forth in
Appendices <u>A</u> – <u>AA</u> which include more than twenty affidavits, witness statements, expert
reports, emails, correspondence, photographs, tape recordings, video footage, deposition
transcripts, hearing transcripts, and other data. The documentary materials in these appendices,
by themselves, consist of thousands of pages. Further, in preparing for presenting its case at a
live hearing USADA had, prior to August 24, conducted numerous witness interviews, and
evaluated mountains of other information regarding its likely witnesses. Once Mr. Armstrong
chose not to proceed to a hearing USADA then obtained affidavits from many of its witnesses
whom USADA had anticipated would have otherwise presented their testimony orally in a live
hearing. Thereafter, USADA has described and summarized the evidence in this Reasoned
Decision. Given the volume of materials that USADA has addressed, the forty-seven days it

The most critical evidence assembled by USADA and discussed in this Reasoned Decision has come from Mr. Armstrong's former teammates and former employees of the United States Postal Service ("U.S. Postal Service" or "USPS") and Discovery Channel cycling teams who decided that it was the right thing to do for clean sport to come forward and provide evidence to USADA regarding what they knew.  As a consequence of a number of courageous riders willingness to break the Code of Silence—the "omerta"—after being approached by USADA, by late May 2012 USADA concluded it had more than enough evidence to proceed with charges against former USPS and Discovery Channel Team Director Johan Bruyneel,[4] former USPS and/or Discovery Channel doctors Pedro Celaya,[5] Luis Garcia del Moral[6] and Michele Ferrari[7] and Team Trainer Jose "Pepe" Marti[8] and against Mr. Armstrong.

USADA also reached out to Mr. Armstrong, communicating with four of his attorneys and giving Mr. Armstrong the opportunity to come in and sit down with USADA and cooperate with USADA's investigation as had many of Mr. Armstrong's teammates.  Mr. Armstrong, however, refused to meet with USADA, setting in motion the sequence of events that led to USADA's charges and ultimately to Mr. Armstrong's sanction by USADA in accordance with the rules.[9]

---

took to organize these materials in an appropriate fashion was reasonable.
[4] Mr. Bruyneel is currently the general manager for the RadioShack-Nissan-Trek Cycling team.
[5] Dr. Celaya is currently the team doctor for the RadioShack-Nissan-Trek Cycling team.
[6] Dr. del Moral is currently a doctor practicing sports medicine in Valencia, Spain.
[7] Dr. Ferrari currently serves as a "consultant" to many professional cyclists.
[8] Until earlier this year Mr. Marti was an employee with a UCI licensed team.  Mr. Marti resides in Valencia, Spain.
[9] In the witness affidavits provided in Appendix A names of individuals who have not yet been charged with doping have been redacted.  USADA's investigation into doping in cycling continues and evidence of doping obtained by USADA and involving individuals who have not already been charged will be handled in accordance with the rules.

I.       SUMMARY OF USADA'S REASONED DECISION

As most observers of cycling acknowledge, cycling in the grand tours, of which the Tour de France is the most important, is a team sport. Lance Armstrong winning seven consecutive Tour de France titles was touted not just as an individual achievement, but as a team achievement rivaling the greatest in professional sports history.

Lance Armstrong himself has said that the story of his team is about how it "evolved from . . . the Bad News Bears into the New York Yankees."[10]  However, as demonstrated in this Reasoned Decision, the achievements of the USPS/Discovery Channel Pro Cycling Team, including those of Lance Armstrong as its leader, were accomplished through a massive team doping scheme, more extensive than any previously revealed in professional sports history. More than a dozen of Armstrong's teammates, friends and former team employees confirm a fraudulent course of conduct that extended over a decade and leave no doubt that Mr. Armstrong's career on the USPS/Discovery Channel Pro Cycling Team was fueled from start to finish by doping.

In this Reasoned Decision we discuss the evidence in significant detail, just as an arbitration panel would have done in announcing its decision had Mr. Armstrong been willing to allow the evidence in his case to be heard by independent arbitrators.  It is important that the evidence in this case be discussed in detail for several reasons.  First, transparency is a fundamental value of the anti-doping movement.  It is important that facts relating to doping not be hidden from public view so that there is confidence in case outcomes and sport can learn from each case.  Thus, the rules require USADA to issue a "reasoned decision" and this document meets that requirement.  Second, over the years Mr. Armstrong and his representatives went to

---

[10] SCA Hearing Transcript, pp. 1374-75 (testimony of Lance Armstrong).